IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, a non-profit organization; WESTERN WATERSHEDS PROJECT, a non-profit organization; and TRAP FREE MONTANA, a non-profit organization, | CV 23–10–M–DLC |
| Plaintiffs, | |
| vs. | ORDER |
| JANET BUCKNALL, in her official capacity as Deputy Administrator, U.S. Department of Agriculture APHIS-Wildlife Services; DALIN TIDWELL, in his official capacity as State Director, Wildlife Services-Montana; UNITED STATES ANIMAL PLANT AND INSPECTION SERVICE, a federal agency; TOM VILSACK, in his official capacity as Secretary of Agriculture; UNITED STATES DEPARTMENT OF AGRICULTURE, a federal department, | |
| Federal Defendants, | |
| and | |
| STATE OF MONTANA and MONTANA DEPARTMENT OF FISH, WILDLIFE, AND PARKS, | |
| Defendant-Intervenors. | |

1

This case challenges the May 2021 Final Environmental Assessment ("EA") and associated Decision and Finding of No Significant Impact ("FONSI") reauthorizing a predator damage and conflict management program in Montana. Under the Decision, Wildlife Services—an agency within the United States Department of Agriculture's Animal and Plant Health Inspection Service—may use traps, snares, aerial shooting, chemicals, toxicants, and other methods to capture and sometimes kill predators, including threatened grizzly bears. Plaintiffs—a coalition of environmental and wildlife organizations—allege that the Federal Defendants violated the National Environmental Policy Act ("NEPA") by failing to include critical information about grizzly bears in the EA and by failing to undergo a more thorough impacts analysis in the form of an environmental impact statement ("EIS").

The Court held a hearing on the parties' summary judgment motions on August 2, 2024.  Ultimately, Plaintiffs are correct that the EA failed to take a "hard look" at the effects of Montana's predator damage and conflict management program on grizzly bears and an EIS is required.  Thus, the Decision is remanded without vacatur for the agency to conduct an EIS.  Wildlife Services may continue to operate under the Decision until a new EIS is prepared.  But to ensure the necessary environmental review occurs in a timely manner, that process must be completed by November 1, 2026.

2

Federal Defendants also seek to strike the extra-record deposition of David Mattson. (Doc. 41.) That motion is denied as moot. Plaintiffs recently filed a Notice of Supplemental Authority. (Doc. 63.) Federal Defendants seek leave to respond to this supplemental authority (Doc. 66), which is opposed by Plaintiffs. (Doc. 67.) The Court has read the supplemental authority and understands its relevance, or lack thereof, to the issues in this case. Thus, there is no need for any further briefing on this subject. The Federal Defendants' motion is denied.

BACKGROUND[1]

## I.   Grizzly Bears in the Lower-48

In the 1850s, an estimated 50,000 grizzly bears roamed across all or portions of 18 contiguous western states. WS-ESA-004583. But as European settlers moved west, grizzly bears were deemed a threat to livestock and human safety and quickly became targets of government-funded bounty programs aimed at eradication. WS-ESA-004584. Grizzlies were "shot, poisoned, and trapped

---

[1] The background references both the NEPA and ESA administrative records in this case. Although Plaintiffs have since dropped their ESA claims, both parties repeatedly cite to the ESA record and the background facts are not in dispute. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) (In an APA action, "there are no disputed facts that the district court must resolve. . . . the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."). Therefore, the Court relies, in part, on the ESA administrative record in developing the factual background.

wherever they were found," and the population was eradicated from all but roughly two percent of its former range by the 1930s. *Id.*

In 1975, the U.S. Fish and Wildlife Service ("USFWS") listed grizzly bears in the lower-48 states as a threatened species under the Endangered Species Act ("ESA"). 40 Fed. Reg. 31,734 (July 28, 1975). At the time of listing, the estimated grizzly bear population in the lower-48 states was only 700 to 800 individuals and limited to only a few isolated subpopulations, mostly in Montana. WS-ESA-004585. The isolated nature of these subpopulations was identified as an on-going threat to the species; so too were management removals and mortalities from conflicts with livestock. 40 Fed. Reg. at 31,734; *see also* WS-ESA-004703. Nevertheless, as an exception to the ESA's complete prohibition on "taking" protected species, USFWS developed a special rule under the ESA § 4(d), which allows for the take of grizzly bears under certain limited circumstances, including in self-defense, defense of others, or in response to "significant" livestock depredations. 50 C.F.R. § 17.40(b).

In 1993, USFWS designated six "recovery zones" where it sought to focus its efforts to conserve grizzly bears—the North Cascades, Selkirk, Cabinet-Yaak, Bitterroot Ecosystem ("BE"), Northern Continental Divide Ecosystem ("NCDE"), and Greater Yellowstone Ecosystem ("GYE") recovery zones. WS-ESA-004586. USFWS also designated broader areas called "demographic monitoring areas"

4

("DMAs") around the recovery zones where recovery zone populations are monitored and surveyed. WS-ESA-004590. The agency recognized that to ensure the species' long-term viability and restore populations to areas like the Bitterroot, where local populations had been extirpated, it needed to facilitate grizzly bear movement and "connectivity" between recovery zones. WS-ESA-004589–90; *see also* WS-ESA-004703–18 (discussing the importance of connectivity). Individual grizzly bears require large, intact blocks of land with sufficient habitat for cover and denning, as well as access to sufficient quantity and diversity of natural, high-caloric foods. WS-ESA-004632. At the ecosystem level, grizzly bears require sufficient abundance for genetic diversity, multiple resilient ecosystems distributed across a wide variety of geographic areas, high adult female survival, genetic diversity, and connectivity between recovery zones. WS-ESA-004631, 33–34. High adult female survival rates are especially critical in smaller populations because, having one of the slowest reproductive rates among terrestrial mammals due primarily to the "late age of first reproduction, small average litter size, and the long inter-birth interval, . . . it may take a female grizzly bear 10 or more years to replace herself in a population." WS-ESA-004579.

Historically, human-caused mortality was the primary factor contributing to the grizzly bears' steep decline in the lower-48 states, and it continues to be "the leading cause of grizzly bear mortalities." WS-ESA-004678. Human-caused

5

mortality includes accidental killings, management removals (often in response to

livestock conflicts), mistaken identity killings, defense of life killings, and illegal

killings or poaching. *Id.* Other current stressors or threats to grizzly bears in the

lower-48 states include increases in human-access into areas occupied by grizzly

bears, including motorized access, developed sites, and livestock grazing, the

effects of climate change and changing food sources, and the lack of connectivity,

which is needed for genetic health and long-term species viability. WS-ESA-

004635. USFWS has concluded that "human tolerance much more than habitat,

genetics, or food resources, will determine where bears exist and at what density

levels into the future." WS-ESA-004678.

**II.    Wildlife Services**

Today, grizzly bears are cooperatively managed under the ESA, by USFWS,

as well as tribal, state, and United States and Canadian federal agencies as part of

the Interagency Grizzly Bear Committee ("IGBC"). WS-NEPA-000244. Wildlife

Services is not a member of the IGBC, but pursuant to a series of memorandums of

understanding ("MOUs") with state, tribal, and other federal agencies, Wildlife

Services conducts predator removal operations intended to address "damage" to

livestock and other agricultural interests caused by wildlife. WS-NEPA-000035–

45. Employing both lethal and non-lethal techniques, Wildlife Services is

authorized to use traps, snares, toxins, and ground and aerial gunning to capture

6

and remove "predators," including coyotes, gray wolves, red foxes, bobcats, mountain lions, black bears, and grizzly bears—as permitted by the ESA's § 4(d) exception to the prohibition on taking protected species—when they are deemed to have damaged agricultural interests or pose a threat to human safety. WS-NEPA-000014, 128–29, 249; *see also* 7 U.S.C. §§ 8351–52.

Wildlife Services defines "damage" as a situation in which an individual or entity determines that losses caused by wildlife triggers their threshold for requesting assistance or attempting to take care of the problem themselves. WS-NEPA-000018–19. "Damage" may be economic losses to property or assets, threats to human or pet safety, or a loss in the aesthetic value of property and other situations where the behavior of wildlife is no longer tolerable to an individual person or entity. *Id.*

Wildlife Services "continues to receive increasing numbers of requests for assistance with grizzly bear conflicts," WS-NEPA-000249, as grizzly bears have continued to expand their ranges, moving east of the Rocky Mountains and into prairie habitat where conflicts with agriculture are more likely, WS-NEPA-000246. In many cases where Wildlife Services' assistance is requested, "the agency transfers custody of the grizzly bear to [Montana Fish, Wildlife and Parks ("MFWP")] and is unaware of the fate of that animal." WS-NEPA-000249–50. For instance, in 2013, Wildlife Services received 25 complaints leading to grizzly

7

bear investigative reports, resulting in two transfers of custody with the fate of

those bears unknown to the agency.  WS-NEPA-012566.  The number of

complaints has increased steadily every year, and, in 2019, 157 total complaints

resulted in Wildlife Services killing one bear, freeing one bear, and committing 14

transfers of custody with unknown outcomes.  WS-NEPA-013949.  Most of those

captures (92%) occurred on private land, and the remainder in national forests.

WS-NEPA-000250.

III.   **NEPA Process**

In January 2021, Wildlife Services, in cooperation with the Montana

Department of Livestock, MFWP, the Bureau of Land Management ("BLM"),

United States Forest Service, and USFWS, released a Draft EA on its predator

damage and conflict management program in Montana.  WS-NEPA-000001.  The

analysis relied in part on a 2012 USFWS Biological Opinion, which had concluded

that "the [program] would not jeopardize the grizzly bear population in Montana."

WS-NEPA-000275.

The 2021 Draft EA analyzed five alternative approaches.  *See* WS-NEPA-

000115–16.  The "Proposed Action Alternative," or "No Action Alternative,"

provided that Wildlife Services would continue to offer "a comprehensive range of

legally available lethal and non-lethal methods" for damage management

assistance to property owners or managers suffering livestock depredations and

8

other damage caused by predators.  WS-NEPA-000529.  Under other alternatives

considered by the agency, Wildlife Services would "only operationally engage in

non-lethal" predator control, (Alternative 2), a "reasonable application of non-

lethal methods would have to be shown ineffective to resolve the damage/threat

before [Wildlife Services] could utilize lethal . . . methods," (Alternative 3), or

Wildlife Services "would only provide lethal operational . . . assistance for

protecting human/pet health or safety, to eradicate invasive feral swine, or to

protect ESA-listed species," (Alternative 4).  WS-NEPA-000530.  Under

Alternative 5, Wildlife Services "would not be involved in any [integrated predator

damage management] actions." *Id.*  In the FONSI, Wildlife Services explained

that "[t]he difference between Alternative 1 and Alternatives 2-5 is primarily *who*

provides the lethal management because landowners, private wildlife control

operators, and MFWP are capable of providing lethal [removal] if [Wildlife

Services] cannot provide it."  WS-NEPA-000533.  The agency concluded, "[i]t is

possible that more animals could be taken by other entities as a result of less

selective and less proficient removal efforts, which may increase impacts." *Id.*  In

addition, "non-[Wildlife Services] entities . . . do not have the same skill levels,

equipment, experience, or obligations under NEPA"; thus, "there is likely to be

slightly greater or unreported impacts to non-target species." *Id.*

9

The agency received 871 comment letters in response to the Draft EA. WS-NEPA-000424. In the Final EA, Wildlife Services responded to some of the commenters' specific concerns relevant to grizzly bears. For example, commenters noted that "the EA must meaningfully consider connectivity, which means having a better understanding of the cumulative impact of removing bears outside the DMAs," WS-NEPA-000444, and "often express[ed] concern about the perception of the humaneness of lethal and non-lethal operational methods used by [Wildlife Services] personnel," WS-NEPA-000053.

## IV. Procedural History

This case challenges Wildlife Services' May 2021 Final EA and associated Decision and FONSI, which allows the agency to continue its predator removal activities without change in Montana.[2] Wildlife Services determined an EIS was not warranted because its program did not have a significant impact on the quality of the human environment, and concluded the Proposed Action Alternative "best addresses the need for action and issues identified in the EA." WS-NEPA-000541.

---

[2] Plaintiffs initially challenged the agency's decision not to reinitiate ESA § 7 consultation with USFWS; however, Plaintiffs elected not to pursue their ESA claims after USFWS issued a new Biological Opinion on Wildlife Services' activities on April 12, 2023, nearly two years after Wildlife Services issued the challenged Final EA, Decision and FONSI. WS-ESA-000001; *see also* (Doc. 43, at n.1). In light of Plaintiffs' Second Amended Complaint omitting those claims, the Court has denied as moot Defendant-Intervenors' partial motion for summary judgment, which was based solely on Plaintiffs' ESA claims. (Doc. 48.)

Plaintiffs allege the agency violated NEPA by not adequately analyzing the direct, indirect, and cumulative effects of its predator damage management activities in Montana and by failing to prepare a detailed EIS.

In particular, Plaintiffs argue the EA is devoid of specific, up-to-date, and accurate information about where, why, and how many grizzly bears are killed by Wildlife Services (including the sex of the removed bears), and fails to analyze how lethal removals of grizzly bears outside of recovery zones and DMAs may adversely affect population dispersal and connectivity between recovery zones, or how the agency's removal actions may cumulatively affect the species. Plaintiffs further argue there are substantial questions regarding the efficacy of lethal removal activities designed to protect livestock, which warrants the preparation of a more robust EIS. Plaintiffs ask the Court to declare that Wildlife Services violated NEPA; remand the matter to the agency for a new NEPA analysis; vacate the part of the decision that allows Wildlife Services to lethally take grizzly bears in Montana; and enjoin Wildlife Services' lethal removal of grizzly bears absent "a demonstrable threat to human safety." (Doc. 43 at 61.)

Federal Defendants maintain that Wildlife Services took a "hard look" at the potential environmental consequences of its predator removal program and reasonably determined that continuing its activities would not cause significant impacts to grizzly bears, grizzly bear connectivity, or grizzly bear recovery.

11

LEGAL STANDARDS

## I.     National Environmental Policy Act ("NEPA")

A procedural statue, NEPA "prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).  While NEPA does not "mandat[e] that agencies achieve particular substantive environmental results," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989), it aims (1) to "place[] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action[,]" and (2) "ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process," *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).  Thus, a district court's role under NEPA "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* at 97–98.

While NEPA does "not require agencies to elevate environmental concerns over other appropriate considerations[,]" the agency must "take a 'hard look' at the environmental consequences before taking a major action." *Id.*  An agency adequately conducts a "hard look" when it provides "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a proposed action. *Center for Biological Diversity v. Nat'l Highway Traffic*

12

*Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008).  Taking a "hard look" at the potential environmental consequences "should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *League of Wilderness Defs.-Blue Mtns. Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012) (internal quotation marks and citations omitted).

Agencies have "discretion to determine the physical scope used for measuring environmental impacts." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).  When considering whether an agency took the requisite hard look under NEPA, courts defer to an agency's decision "only if it is fully informed and well-considered," and "review is limited to the grounds that the agency invoked when it took the action." *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 551 (9th Cir. 2024) (internal citations and quotations omitted)).

## II.   Administrative Procedure Act ("APA")

Because NEPA does not create a cause of action, NEPA claims are reviewed under the Administrative Procedure Act ("APA"). *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002).  The APA requires a reviewing court to hold unlawful and set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "[R]eview under the arbitrary and capricious standard is narrow, and [a court should] not substitute [its] judgment for that of the agency." *Earth Island*

*Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (citations and quotation marks omitted).

A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Although . . . review under the arbitrary and capricious standard is deferential, an agency's finding of no significant impact is arbitrary or capricious if the petitioner has raised substantial questions whether a project may have a significant effect on the environment." *Blue Mtns. Biodiversity Project v. Jeffries*, 99 F.4th 438, 447 (9th Cir. 2024).

## III.   Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party. *Id.*  The moving party bears the initial burden

14

of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the party opposing the motion must present specific facts, supported by admissible evidence, showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–49; Fed. R. Civ. P. 56(e). In cases involving the review of final agency determinations under the APA, review is limited to the administrative record. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994); *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985) (when reviewing a decision of an administrative agency, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did").

## DISCUSSION

Plaintiffs allege that Wildlife Services violated NEPA in four distinct ways: (1) by failing to include specific, updated, and accurate information about where, why, and how grizzly bears are lethally removed, including the sex of the bear, in the EA; (2) by failing to analyze how lethally removing grizzly bears may adversely affect dispersal and connectivity between recovery zones; (3) by failing to analyze the cumulative effects of lethally removing grizzly bears; and (4) by failing to prepare an EIS. Federal Defendants disagree, and argue Plaintiffs lack

standing because their claims are not redressable.  Each argument is addressed in turn, beginning with Federal Defendants' challenge to Plaintiffs' standing.

## I.  Standing

"To establish Article III standing, a plaintiff must demonstrate that: (1) he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014).  Redressability requires that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "A plaintiff's burden to demonstrate redressability is relatively modest. . . .  She need not demonstrate that there is a guarantee that her injuries will be redressed by a favorable decision; rather, a plaintiff need only show a substantial likelihood that the relief sought would redress the injury." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (internal quotations and citations omitted).  And "the mere existence of multiple causes of an injury does not defeat redressability, particularly for a procedural injury." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015).

Federal Defendants challenge Plaintiffs' showing of redressability on two grounds.  First, Federal Defendants argue that "[e]ven if Plaintiffs obtained [their

requested] relief, lethal removals of grizzly bears in Montana—Plaintiffs' alleged

harm—would continue to occur" as other entities would inevitably continue to

lethally remove grizzly bears under the ESA's § 4(d) rule. (Doc. 40 at 18.)

Second, Federal Defendants argue that because USFWS is ultimately responsible

for authorizing lawful grizzly bear removals in Montana, whether Plaintiffs'

alleged injury is redressable depends on "unpredictable actions of third parties,"

namely, USFWS. (*See* Doc. 50 at 4–5 (citing *Barnum Timber Co. v. EPA*, 633

F.3d 894, 900 (9th Cir. 2011)).)  Neither argument is persuasive.

Because Plaintiffs seek "to enforce a procedural right under NEPA, the

requirements for causation and redressability are relaxed." *WildEarth Guardians*,

795 F.3d at 1155.  Rather than an abrupt "end [to *all*] lethal grizzly bear damage

management" as Federal Defendants' argument suggests, (Doc. 40 at 19), Plaintiffs

seek a pause in Wildlife Services' authorization to conduct lethal removals until

the agency can properly address Plaintiffs' concerns by way of a new analysis and

Decision documents that comply with NEPA.  As articulated in the State of

Montana and MFWP's motion to intervene, Plaintiffs' requested relief is likely to

"significantly impact Montana's capacity to respond to depredation incidents

requiring lethal take of grizzly bears," (Doc. 24 at 9), shifting a "significant and

unwieldy burden" to Montana to respond to livestock depredation complaints *and*

non-livestock conflicts, and forcing Montana to "prioritize certain incidents over

17

others." *Id.* at 13–14.  Thus, it is "likely, as opposed to merely speculative," *Lujan*,

504 U.S. at 561, that some lethal removals of grizzly bears in Montana would not

occur should Plaintiffs receive their requested relief.  *See also W. Watersheds*

*Project v. Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019); *Nat'l Fam. Farm Coal. v.*

*U.S. Env't Prot. Agency*, 966 F.3d 893, 910 (9th Cir. 2020).

     Further, it is entirely plausible that a more robust analysis with updated

information that addresses important issues like connectivity and the cumulative

impacts of lethally removing female bears and grizzly bears outside of DMAs may

change how Wildlife Services operates in the future, even if only in small ways or

certain places—like linkage areas.  Regardless, should requiring Wildlife Services

to adequately analyze the impacts of its predator damage management program

with up-to-date, context-appropriate data ultimately result in the same decision,

NEPA has nonetheless served its purpose by holding the federal agency to the

"hard look" standard of decision making via a public process.  This core premise of

environmental law is well-established.  *See e.g. Cantrell v. City of Long Beach*,

241 F.3d 674, 682 (9th Cir. 2001) (holding that plaintiffs had standing to challenge

the adequacy of the Navy's final EIS even though they could not show a revised

EIS would result in a different reuse plan for the Naval Station); *Lujan*, 504 U.S. at

572 n.7 (noting that a person living adjacent to the construction site of a federally

licensed dam would have standing to challenge the agency's failure to prepare an

EIS, even though he could not establish with any certainty that the EIS would cause the license to be withheld or altered); *see also Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008) ("That it is uncertain whether reinitiation will ultimately benefit the groups (for example, by resulting in a "jeopardy" determination [under the ESA]) does not undermine [the plaintiffs'] standing."). Accordingly, Plaintiffs have standing to pursue their NEPA claims.

## II.        Deficiencies in the EA

An agency's decision is arbitrary and capricious if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *State Farm*, 463 U.S. at 43. "Whether an agency has overlooked 'an important aspect of the problem' . . . turns on what [the] relevant substantive statute makes 'important.'" *Or. Natural Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996).

Plaintiffs raise three primary concerns about Wildlife Services' analysis in the EA. First, Plaintiffs argue the EA is lacking because the data on grizzly bear mortalities is outdated[3] and the EA does not include essential information, like the

---

[3] Plaintiffs also challenged the accuracy of some of the mortality data included in the EA, but Federal Defendants clarified in the briefing that the data sets Plaintiffs were comparing encompassed different geographic areas. (*See* Doc. 40 at 30.)

sex of removed grizzly bears and where they were captured.  Second, Plaintiffs argue the lack of data resulted in Wildlife Services neglecting to analyze the effects of lethal removals that occur in critical areas outside of recovery zones or DMAs, and how the sex of removed bears may affect connectivity and the long-term genetic health of isolated grizzly bear populations.  Third, Plaintiffs assert the agency's numbers-based cumulative effects analysis is fundamentally flawed. Federal Defendants counter that Wildlife Services took a "hard look" at the potential impacts of its actions and reasonably concluded the effects of the agency's predator removal program were not significant, satisfying its obligations under NEPA.  These arguments are addressed in turn.

### A.    *Lack of specific, updated information about lethal removals*

"[A]n agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d at 1291, 1301 (9th Cir. 2003) (citing 40 C.F.R. § 1502.9(a)–(b)).  "NEPA requires that the public receive the underlying environmental data from which [an agency] expert derived her opinion." *Id.* at 1300.  "Reliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011) (explaining that "faulty reliance" on stale data during an environmental impact analysis "does not

20

constitute the 'hard look' required under NEPA"). An agency's "choice of analysis scale must represent a reasoned decision and cannot be arbitrary." *Idaho Sporting Cong.*, 305 F.3d at 973.

       *1.    Missing data*

Plaintiffs argue the EA fails to include specific, up-to-date, and accurate information on where grizzly bears are killed, the sex of the bears, the circumstances surrounding the removals, and the fate of transferred bears, which Plaintiffs claim dooms the agency's subsequent analysis because the best available science is clear that female grizzly bears have greater impacts on long-term species viability than male bears, especially in and around recovery zones with smaller resident populations. In response, Federal Defendants counter that Plaintiffs' demands are unreasonable because "there is no population information from which to calculate mortality rates outside of the DMAs," (Doc. 40 at 25), and also that Plaintiffs "merely demand information that is already in the EA," in the form of a table titled "Population impact analysis of grizzly bear take inside the DMA of the GYE, CY2013 – CY2017," (*id.* at 27).

Addressing Federal Defendants' second argument first, this table plainly does not contain the information Plaintiffs seek for two obvious reasons. For one, the title of the table makes clear its data is limited to an accounting of grizzly bear take *inside* a single recovery zone. Second, a footnote to the cited table specifies

that "all causes of mortality (natural, unknown, etc.) are counted against the

mortality threshold for independent grizzly bears[,]" so the population data is

general to all mortalities, rather than specific to takes by Wildlife Services.  WS-

NEPA-000254.  Concerning Federal Defendants' first claim, at oral argument, the

Court inquired as to the availability of the specific information at issue, including

the precise locations where grizzly bears are captured, the sex of the bears, the

circumstances surrounding the removals, and the fate of transferred bears.  Counsel

for Federal Defendants confirmed that, although Wildlife Services does not track

those details, the sought-after information would be contained in § 4(d) "take

report forms" completed at the time of captures, which are then submitted to and

tracked by USFWS and/or MFWP.  Despite this availability, however, that

information was not included in the EA.  Therefore, neither of Federal Defendants'

arguments regarding the lack of essential information in the EA hold up.

As argued by Plaintiffs, it is well-established that the loss of even a few

female grizzly bears in some areas could have a significant effect on the local

population because "it may take a female grizzly bear 10 or more years to replace

herself in a population" as grizzly bears are one of the slowest reproducing animals

in North America.  WS-ESA-004579.  As Plaintiffs point out, this impact is

particularly significant in the Cabinet-Yaak Ecosystem, where "the difference

between [population] growth and decline is 1 or 2 adult females being killed

annually or not." FWS-001546 (concluding that "movement by female bears is most important for demographic rescue of populations"). And in the Bitterroot Ecosystem, a single female may be the difference between re-establishing a population of grizzly bears, or not. *See* WS-ESA-004716–18, 59 (discussing the importance of female immigration for natural recolonization).

Plaintiffs are correct that the EA neither includes nor discusses any data denoting the sex or locations of Wildlife Services' lethal grizzly bear removals or the ultimate fate of the transferred bears. Further, what little information does exist in the EA is expressly limited to mortalities that occurred inside recovery zones and DMAs. But, as Plaintiffs note, grizzly bears taken outside or in-between recovery zones—particularly if they are female—are arguably the most important bears because they are critical to establishing natural connectivity, an essential component to species recovery in certain ecosystems and necessary for long-term genetic viability in all isolated grizzly bear populations in the lower-48 states. *See* WS-ESA-004717–18 (concluding that "because of the small populations sizes in the [Cabinet-Yaak] and [Selkirk ecosystems], and the lack of known populations in the [Bitterroot Ecosystem] and North Cascades, isolation is still a potential future threat to the resiliency of these populations"); WS-ESA-004631–34 (summarizing grizzly bear needs in the lower-48 states); *see also Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1004, 1008 (D. Mont. 2018) (finding that the USFWS

had "engaged in a process of real-time 'balkanization'" by designating the Greater Yellowstone Grizzly as a discrete population segment and delisting it under the ESA without properly analyzing the effects of delisting on the remnant populations of grizzly bears), *affirmed by Crow Indian Tribe v. United States*, 965 F.3d 662, 679 (9th Cir. 2020) ("[A] lack of genetic diversity continues to threaten the Yellowstone Grizzly.").

Federal Defendants maintain that Wildlife Services' "collection and assessment of technical data is subject to the highest level of deference under the APA," (Doc. 40 at 26), but an agency's decisions are only entitled to deference if those decisions are "fully informed and well-considered." *Friends of the Inyo*, 103 F.4th at 551. Here, Plaintiffs have shown the best available science supports their claim that data such as the sex and location of removed grizzly bears, as well as how many bears are eventually killed, is critical to the analysis. Because critical "data [was] not available during the [NEPA] process and [was] not available to the public for comment[,] . . . in such a situation, the [NEPA] process [could not] serve its larger informational role, and the public [was] deprived of their opportunity to play a role in the decision-making process." 668 F.3d at 1085.

### 2. *Stale data*

Next, Plaintiffs fault the agency for relying on a 2012 Biological Opinion, which was ultimately updated by the USFWS in 2023 after Plaintiffs initiated this

24

litigation.  Plaintiffs argue that the mortality data and analyses in the EA are outdated because the 2021 Final EA limits its review to the years 2013 through 2017.  Federal Defendants counter that the EA "provides a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences' based on the data between 2013 and 2017" and "Plaintiffs fail to explain why an additional *two* years of grizzly bear mortality data and population trends are necessary."  (Doc. 40 at 29 (emphasis in original).)

Contrary to Federal Defendants' argument, Plaintiffs point to ample evidence in the administrative record to support their contention that the agency's reliance on outdated mortality data and the 2012 Biological Opinion fails to satisfy NEPA's "hard look" requirement.  For one, Plaintiffs are not the only entities to point out in comments to the Draft EA that the best available science on grizzly bear recovery has evolved as grizzly bears have expanded their range in recent years.  For example, one interagency response to the Draft EA noted that "[d]ata presented in the [Draft EA] is frequently from 2017 or 2018," and recommended "updating through 2019 throughout."  WS-NEPA-001898.  Regarding the 2012 Biological Opinion, the BLM expressed concern that the EA did not contain the "best available science" because "grizzly bears have greatly expanded their distribution since the 2012 [Biological Opinion] . . . [c]onsultations are dated and likely do not use the best available science."  WS-NEPA-001832–34.

25

Additionally, as the narrative in the EA indicates, the data in the record shows a steady increase in the number of grizzly bear investigative reports Wildlife Services conducts each year. For instance, in 2013, Wildlife Services received 25 complaints leading to grizzly bear investigative reports, resulting in two captures and subsequent transfers of custody. WS-NEPA-012566. By 2017, the number of complaints had reached 98, increasing by an average of roughly 18 complaints per year. *See* WS-NEPA-012580. But in 2018, the number of complaints jumped to 138—an increase of 40 in just one year—and in 2019, there were 157 complaints resulting in one killed bear, one freed bear, and 14 transfers of custody, the highest year of total captures in the record. *See* WS-NEPA-013949. Again, this increase makes sense and the upward trend in the number of conflicts is acknowledged in the EA's narrative, but the agency's decision to cut off the data to right before such a significant jump occurred is both concerning and entirely unexplained in the EA—in other words, it is arbitrary. *See Arbitrary*, Merriam-Webster Dictionary (last visited Nov. 7, 2024), https://www.merriam-webster.com/dictionary/arbitrary ("existing or coming about seemingly at random or by chance").

Moreover, under NEPA, Wildlife Services had an obligation to ensure that the relevant data existed "*before approval* so that [it could] understand the adverse environment effects *ab initio*." *N. Plains Res. Council*, 668 F.3d at 1085. In response to this litigation, the agency opted to reinitiate ESA § 7 consultation with

USFWS to bring the data in the 2012 Biological Opinion in line with more current

grizzly bear science. That new biological opinion was initiated in 2021 and

finalized in 2023, well after the Final EA, Decision, and FONSI at issue here were

complete. In response to Plaintiffs' complaints about outdated data in the 2012

Biological Opinion, Federal Defendants now point to the 2023 Biological Opinion,

conflating the significance of USFWS's post-decisional "no-jeopardy" finding

under ESA standards with Wildlife Services' prior "finding of no significant

impact" under NEPA.

It is well-established that these two findings are not the same thing. The

purpose of consultation under § 7 of the ESA is to ensure that a federal agency's

actions are "not likely to jeopardize the continued existence of any endangered

species or threatened species." 16 U.S.C.A. § 1536. Critically, "the ESA's

Section 7 consultation process fails to provide for public comment in the same way

that NEPA does," and "the ESA only requires agencies to consider the cumulative

impacts of non-federal actions, while NEPA requires agencies to consider the

cumulative impacts of all actions." *San Luis & Delta-Mendota Water Auth. v.*

*Jewell*, 747 F.3d 581, 649–50 (9th Cir. 2014) ("We cannot say that Section 7 of the

ESA renders NEPA 'superfluous' when the statutes evaluate different types of

environmental impacts through processes that involve varying degrees of public

27

participation."). Thus, the existence of a post-decisional "no-jeopardy" finding by USFWS does not remedy the deficiencies in Wildlife Services' EA.[4]

### 3. Conclusion

In sum, because critical information was omitted from the EA, and much of the evidence before the agency was "too stale to carry the weight assigned to it," *N. Plains Res. Council*, 668 F.3d at 1086, Wildlife Services could not have made "a reasoned decision based on its evaluation of the evidence," *Earth Island Inst.*, 351 F.3d at 1301. As discussed above, the sex of lethally removed grizzly bears and the location and circumstances of their capture, as well as the ultimate fate of transferred bears, is essential to any fully-informed discussion regarding the impacts of Wildlife Services' predator damage management activities. Wildlife Services "failed to consider an important aspect of the problem" when it determined that the specific location, sex, and ultimate fate of the grizzly bears it lethally removes were not critical to the EA's analysis.

---

[4] This line of reasoning is distinct from a related argument made by Federal Defendants, in which they argue the *Crow Indian Tribe* cases, 965 F.3d 662 (9th Cir. 2020) and 343 F. Supp. 3d 999 (D. Mont. 2018), are inapposite because they involved USFWS's decision to delist the Greater Yellowstone Grizzly under the ESA. (*See* Doc. 50 at 11.) In *Crow Indian Tribe*, this Court and the Ninth Circuit Court of Appeals recognized the importance of connectivity to the long-term viability of grizzly bears in the lower-48 states. That factual finding is thoroughly supported by the scientific literature and is relevant here because it establishes an important aspect of the problem and significant impacts under NEPA.

**B.     *Connectivity and Cumulative Effects***

Cumulative effects result from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.[5] "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* "A cumulative impact analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *N. Plains Res. Council*, 668 F.3d at 1076 (citations and quotation marks omitted).

Plaintiffs next argue that the EA is arbitrary and capricious because it fails to discuss the direct, indirect, or cumulative impacts of Wildlife Services' predator damage management activities on natural connectivity and grizzly bear movement between recovery zones.  Federal Defendants respond that Wildlife Services' cumulative effects analysis is sufficient because the EA provided "comprehensive data about grizzly bear populations and mortalities *in the recovery zones*." (Doc. 40 at 33 (emphasis added).)  Again, Federal Defendants primarily rely on the

---

[5] NEPA's implementing regulations were updated effective September 14, 2020. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (Update to NEPA Regulations), 85 Fed. Reg. 43,304 (July 16, 2020).  Those regulations have since been amended again, effective July 1, 2024.  *See* National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. 35,442 (May 1, 2024).  As the parties confirmed at oral argument, this case involves the pre-2020 regulations that were in effect when Wildlife Services initiated its NEPA process.

discredited argument that mortality data outside the recovery zones is not available and therefore Wildlife Services' decision not to consider it was reasonable.

Although there is some discussion about the direct and indirect effects of lethally removing grizzly bears due to conflicts occurring outside recovery zones in the EA, that discussion is limited to "young males" who have made "excursions into areas of the [Greater Yellowstone Ecosystem]." WS-NEPA-000251. The EA concludes that "[w]hen lethal removal is the management option selected this could reduce the rate of range expansion," but "[g]iven[] the negligibly low numbers of grizzly bears expected to be taken, we do not expect any significant indirect impacts to grizzly bears due to [integrated predator damage management] conducted by [Wildlife Services]." *Id.* While this brief discussion hints at the issue of connectivity, it does not adequately address the issue because it fails to consider the potential impacts of lethally taking female grizzly bears, or grizzly bears of any sex beyond the Greater Yellowstone Ecosystem. Regarding cumulative effects, the EA contains a relatively robust discussion of "cumulative take," but that discussion is limited to mortalities occurring "inside the DMAs in Montana." WS-NEPA-000251–57. The EA concludes that "[g]iven the growing population trend and expanding distribution for grizzly bears in the state and close monitoring and coordination by the USFWS and MFWP, cumulative human-

caused mortality[,] including take by [Wildlife Services], is not adversely impacting the population." WS-NEPA-000257. Again, this is insufficient.

Wildlife Services received hundreds of comments to the Draft EA from members of the public as well as other governmental entities. *See* WS-NEPA-000424 (public comments); WS-NEPA-001832–37 (BLM); WS-NEPA-001888–89 (U.S. Forest Service); WS-NEPA-001898 (USFWS); WS-NEPA-001907–10 (MFWP); WS-NEPA-001911–22 (USFWS). The EA acknowledges that, in general, commenters raised concerns about the lack of any analysis on connectivity, noting "[c]ommenters state that the EA must meaningfully consider connectivity which means having a better understanding of the cumulative impact of removing bears outside the DMA's." WS-NEPA-000444. In particular, the USFWS submitted the following comment:

> The [Draft EA]. . . estimates future take of grizzly bears based on recent historical take within the DMAs. **Impacts to grizzly bears should also be analyzed for any take expected elsewhere in the state, not only in DMAs.** The species is currently listed so all lethal removals are subject to USFWS approval even if they don't count against mortality limits for the DMAs. In addition, **some areas outside of the DMAs between NCDE, GYE, and BE have been identified as important for connectivity** even though they are outside the NCDE and GYE DMAs and the BE recovery zone. Thus, the analysis presented for the DMAs does not capture other effects to grizzly bear populations/recovery that may occur due to removal of individuals elsewhere in the State.

WS-NEPA-001917–18 (emphasis added). Consistently, the USFWS's separate submission of "General Grizzly Bear Comments" included the following remark:

> The [Draft EA]'s lethal take discussion is specific to the Demographic Monitoring Areas . . . .  The [EA] should discuss expected future lethal take Statewide and its impacts to grizzly bear populations and recovery. **Please include an assessment of the effects of lethal take within connectivity/linkage areas between Recovery Zones**; we are concerned that take limits within these areas are not defined.

WS-NEPA-001898 (emphasis added).[6]  Wildlife Services dismissed these

concerns, reasoning that because "[b]ears outside of recovery zones and DMAs are

not part of an established population, [] cumulative impacts cannot be adequately

measured as population data does not exist for these areas."  WS-NEPA-000444.

But total "cumulative mortality" and the "cumulative impacts" of that

mortality are not one and the same.  As Federal Defendants concede, cumulative

mortality may be a necessary component of a cumulative impacts analysis, but "it

is not a sufficient description of the actual environmental effects that can be

expected."  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir.

2006).  Simply adding up grizzly bear mortalities does not amount to a useful

---

[6] To aid in this assessment, the commenter suggested that the agency review the "linkage discussion" in Peck et al. (2017), as well as the "Population Connectivity" section of the NCDE Conservation Strategy. WS-NEPA-001898.  Peck et al. (2017) was reviewed but not cited in the EA because Wildlife Services determined it did not "add substantively to the information and analyses in the EA."  WS-NEPA-000442.  Wildlife Services declined to analyze the impacts of its actions within the context of the NCDE Conservation Strategy "[b]ecause the USFWS is not moving forward with delisting of grizzly bears in the NCDE until a legally defensibly strategy for delisting can be identified, which may include revising the Conservation Strategies."  WS-NEPA-000247.

analysis, especially when the underlying data is limited to mortalities occurring

inside artificial lines on a map.  This myopic approach turns a blind eye to the

possibility that a more qualitative, versus quantitative, effects analysis may be

appropriate in this case.  As the USFWS commenter noted, "the analysis . . . does

not capture other effects to grizzly bear populations/recovery that may occur due to

removal of individuals elsewhere in the State."  WS-NEPA-001917–18.

Wildlife Service also reasoned that "[b]ecause USFWS monitors population

trends and mortality, it is unlikely that [Wildlife Services] would lethally remove

grizzly bears in a manner that would negatively affect their populations."  WS-

NEPA-000444.  However, Wildlife Services cannot avoid conducting required

analysis by passing the buck to USFWS, the agency that ultimately decides

whether to lethally remove a particular bear.  *See W. Watersheds Project v. USDA*

*APHIS Wildlife Servs.*, 320 F. Supp. 3d 1137, 1149 (D. Idaho 2018) (finding

Wildlife Services' comment "that it only responds to the requests for predator

control by other agencies who are in the best position to determine the

effectiveness of any specific [predator damage management] program" was "not a

sufficient response under NEPA").  Under NEPA, the scope of Wildlife Services'

review must include the effects of all "connected action[s]," which are defined as

"closely related and therefore should be discussed in the same impact statement."

40 C.F.R. § 1508.25.  Thus, regardless of who ultimately kills the bear, the impact

of lethal removals occurring outside of recovery zones must be assessed—

particularly in and around identified linkage areas, which could affect natural

connectivity. *See Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir.

2002) ("If it is reasonably possible to analyze the environmental consequences in

an EIS . . . , the agency is required to perform that analysis.")).

By shrugging off legitimate concerns about connectivity and declining to

analyze the cumulative effects of lethal grizzly bear removals occurring outside of

recovery zones and DMAs in the EA, Wildlife Services failed to provide "a

reasonably thorough discussion of the significant aspects of the probable

environmental consequences" of the proposed action, *Center for Biological

Diversity*, 538 F.3d at 1194, amounting to an arbitrary and capricious decision

under the APA, *State Farm*, 463 U.S. at 43.

## III.      Failure to Prepare an EIS

NEPA requires agencies to prepare a detailed EIS for all "major Federal

actions significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(2)(C).  Rather than prepare a full EIS, an agency may limit its analysis by

preparing a more concise EA "for a proposed action that is not likely to have

significant effects or when the significance of the effects is unknown." *Winter v.

Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 16 (2008).  "If the agency concludes there

is no significant effect associated with the proposed project, it may issue a FONSI

in lieu of preparing an EIS." *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *see* 40 C.F.R. § 1508.13.

In determining whether the effect of a proposed action is significant, an agency must consider both its "context and intensity." 40 C.F.R. § 1508.27. Context "delimits the scope of the agency's action, including the interests affected." *Blue Mtns.*, 99 F.4th at 448; 40 C.F.R. § 1508.27(a). "Intensity refers to the severity of impact within the selected context." *Blue Mtns.*, 99 F.4th at 448; 40 C.F.R. § 1508.27(b). Factors that inform an agency's intensity determination may include "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas, § 1508.27(b)(3); the degree to which the effects are likely to be "highly controversial," § 1508.27(b)(4), or "highly uncertain," § 1508.27(b)(5); "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," § 1508.27(b)(7); and "[t]he degree to which the action may adversely affect an endangered or threatened species" under the ESA, § 1508.27(b)(9). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment," and "[s]ignificance cannot be avoided by terming an action temporary or by breaking it down into small component parts." § 1508.27(b)(7). "A significant effect may exist even if the federal agency believes that on balance the effect will

35

be beneficial." § 1508.27(b)(1). The presence of one factor alone may, in some cases, be enough to warrant an EIS. *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864–65 (9th Cir. 2005).

In the Ninth Circuit, "[a] plaintiff raising a NEPA claim need only raise substantial questions as to whether a project may have a significant effect to trigger the requirement for an EIS; the plaintiff need not show that significant effects will in fact occur." *Id.*; *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 868 (9th Cir. 2020). "If an agency . . . opts not to prepare an EIS, it must put forth a 'convincing statement of reasons' that explain[s] why the project will impact the environment no more than insignificantly." *Ocean Advocs.*, 402 F.3d at 864. Here, the significance factors weigh in favor of requiring an EIS.

### A.    *Cumulatively Significant Impacts*

First, as discussed above, connectivity is critical to any informed discussion regarding long-term effects to grizzly bears in the lower-48 states. Because Wildlife Services failed to discuss connectivity at all in the EA, and because it based its analysis on outdated, incomplete data, the cumulative effects of lethally removing grizzly bears—particularly female grizzly bears—from linkage areas outside of the DMAs are unknown, and "substantial questions [exist] as to whether

36

[the agency's actions] may have a significant effect." *Ocean Advocs.*, 402 F.3d at 864–65. Thus, based on this issue alone, Wildlife Services must prepare an EIS.[7]

### B.   *Unique or Ecologically Sensitive Areas*

Second, Wildlife Services is authorized to lethally remove grizzly bears from geographic areas with "unique characteristics," including designated Special Management Areas across Montana, like National Parks, Wilderness Areas, Wilderness Study Areas, National Historic Sites, Recreation Management Areas, Wild and Scenic Rivers, [and] Areas of Critical Environmental concern. WS-NEPA-000349–52. Noting that historically, Wildlife Services has engaged in

---

[7] Plaintiffs also challenge Wildlife Services' failure to analyze the cumulative effects of its activities when added to other take of predatory animals, including coyotes, which Montana residents may take "year-round for any reason" and without any reporting requirements. WS-NEPA-000190. Plaintiffs argue Wildlife Services "has *no idea* whether the cumulative take of coyotes in Montana exceeds the sustainable harvest level of 35,280 coyotes (60 percent of the estimated total population of 58,800 individuals)." (Doc. 45 at 30.) Wildlife Services states that it relies on conservative population estimates and coordination with other agencies to ensure its activities do not cause significant cumulative effects to predator populations. *See* WS-NEPA-000542. However, this "is not a sufficient response under NEPA." *W. Watersheds Project*, 320 F. Supp. 3d at 1149 (citing *Kern*, 284 F.3d at 1073–74 (holding that agency could not rely on a "promise of a later site-specific analysis" to substitute for an adequate effects analysis)). In response to Plaintiffs' concerns about cumulative effects to coyotes, Federal Defendants argue the issue was not properly raised in the Amended Complaint. Indeed, Plaintiffs raised the need to prepare an EIS due to significant cumulative effects and discussed Montana's liberal predator removal policies, but only in the context of its effects on the incidental take of grizzly bears. (Doc. 14 ¶¶ 97, 100, 215). Because this issue was not adequately pled, it is not considered as an independent claim here, though it may be prudent for the agency to thoroughly address it on remand.

"limited" predator damage management activities in Special Management Areas, the EA opines that the amount of predator damage management activities forecast to occur in designated Wilderness Areas and Wilderness Study Areas is negligible under all alternatives.  WS-NEPA-000353.

Citing *Western Watersheds Project*, Plaintiffs argue that regardless of the frequency of the occurrence, conducting predator removal operations in Wilderness and Wilderness Study Areas is a reason for requiring Wildlife Services to prepare an EIS.  320 F. Supp. 3d at 1150 (finding that Wildlife Services-Idaho's stated "high" or "extremely high" probability that it will conduct lethal removal operations in unique areas, including a Wilderness Study Area and an Area of Critical Concern, provided "yet another reason for requiring an EIS").  Without citing any authority, Federal Defendants counter that "the inquiry is not whether there are unique characteristics of the geographic area; instead, the inquiry is whether [Wildlife Services' predator damage management] activities would *significantly* affect any of these areas."  (Doc. 40 at 41.)  Federal Defendants are incorrect.  Each intensity factor does not require its own significance finding—the fact that the proposed action may occur in ecologically critical areas is one factor that "should be considered in evaluating intensity" because that fact may affect "the severity of the impact"; or in other words, the "intensity" of the action.  40 C.F.R. § 1508.27(b).

Additionally, Federal Defendants' argument fails to consider the "context" of the proposed action in this case. "Context" . . . means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." § 1508.27(a). Critically, "[s]ignificance varies with the setting of the proposed action. . . . [and] both short and long-term effects are relevant." *Id.* Here, it is both the *context* of the action—including the unknown long-term effects of Wildlife Services' lethal removals—as well as the *intensity* of the action—which takes place in areas that are ecologically unique, not only those areas that are labeled as such but also areas serving as (or with the potential to serve as) critically-important linkage areas— that make the effects "significant," or at minimum, "raise substantial questions" as to whether the effects may be significant. *Ocean Advocs.*, 402 F.3d at 865.

## C.      *Highly Controversial or Uncertain*

The third and fourth relevant factors involve the degree to which "the effects on the quality of the human environment are likely to be highly controversial," § 1508.27(b)(4), or "the possible effects on the human environment are highly uncertain or involve unique or unknown risks," § 1508.27(b)(5). "A project is 'highly controversial' if there is a substantial dispute about the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Native Ecosystems Council*, 428 F.3d at 1240 (cleaned up). "A substantial dispute

39

exists when evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1069 (9th Cir. 2014). "[M]ere opposition alone is insufficient to support a finding of controversy." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019).

Effects are "highly uncertain" when uncertainty about the actions' effects may be resolved by further collection of data or where the collection of such data "may prevent speculation on potential effects." *Nat'l Parks & Conserv. Ass'n v. Babbit*, 241 F.3d 722, 732 (9th Cir. 2001), *abrogated on other grounds by Monsanto v. Greertson Seed Farms*, 561 U.S. 139 (2010). "The purpose of an EIS is to obviate the need for such speculation." *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988).

Plaintiffs primarily argue Wildlife Services' lethal predator removal activities are "highly controversial" and involve "highly uncertain" effects because a significant body of recent scientific research questions whether lethal removal is more or less effective than non-lethal removal in reducing livestock depredations; a question that Wildlife Services summarily dismissed in its EA. To support their claim, Plaintiffs identify considerable scientific evidence indicating there is some controversy surrounding the efficacy and other negative effects of lethally removing apex predators. Specifically, Plaintiffs point to Treves (2016), Wielgus

40

and Peebles (2014), Lennox (2018), Santiago-Avila (2018), Moreira-Arce (2018), Miller (2016), Eklund (2017), van Eden (2018a) and (2018b), and Treves (2019). (*See* Doc. 33 at 38–40.)  Plaintiffs also rely on two recent cases where Wildlife Services' dismissal of controversial scientific opinion on the issue warranted remand for the agency to conduct an EIS.  In *Wildlands v. Woodruff*, the district court in Washington required the agency to prepare an EIS in part because the court found "it is highly uncertain whether lethal wolf removal actually reduces livestock depredation," noting comments to the EA showing the issue was disputed within the scientific community.  151 F. Supp. 3d 1153, 1165 (W.D. Wash. 2015). Likewise, in *Western Watersheds Project*, the Idaho court found "the agency's attempts to explain away scientific challenges to the effectiveness of predator removal" were "unconvincing."  320 F. Supp. 3d at 1150 ("[I]f the Final EA demonstrates anything, it is that Wildlife Services has serious disagreements with leading experts, and has not given their studies the full attention they deserve.").

Federal Defendants maintain that the agency here did enough to dispose of the controversy surrounding predator removal activities in the EA because Wildlife Services considered Treves (2016) and "[t]he rest of Plaintiffs' referenced articles all make similar conclusions to Treves (2016), so [Wildlife Services] considered them but they were not cited because it was determined that they did 'not add substantively to the information and analyses in the EA.'"  *See* WS-NEPA-000442.

Federal Defendants rely on *WildEarth Guardians v. United States Department of Agriculture*, a case that challenged Wildlife Services' predator damage removal management in Nevada, which also included responding to requests for assistance in Wilderness and Wilderness Study Areas. 2023 WL 5529163, at *1 (D. Nev. Aug. 28, 2023), *appeal docketed*, No. 23-2944 (9th Cir. Oct. 20, 2023). That court concluded "the effects of utilizing [predator damage management] are not unknown or highly uncertain." *Id.* at *5. Additionally, Federal Defendants reference *WildEarth Guardians v. Wehner*, 526 F. Supp. 3d 898, 905–06 (D. Colo. 2021), where a district court in Colorado determined the agency satisfied its obligations under NEPA because there was "a healthy breadth of discussion in the EA concerning the efficacy of lethal [predator damage management]."

Here, the EA concludes that Treves (2016)'s methodology is unreliable when used to assess predation management on livestock because the Before/After-Control/Impact ("BACI") protocol the authors recommend involves "unreplicated sampling," which "can result in differences of opinion about what the results mean, leaving, as usual, the entire assessment to those random processes known as the legal system." WS-NEPA-000099–100 (quoting Underwood (1992)). But importantly, Plaintiffs rely on more than just Treves (2016) for the premise that lethal control of apex predators is ineffective and/or counterproductive, and there is no indication whether any of the other studies Plaintiffs cite used the BACI

protocol or not.  By summarily concluding that none of the other papers "added

substantively to the information or analysis in the EA," Wildlife Services failed to

convincingly discuss, or even acknowledge, the legitimate scientific debate.

In addition, more than merely an "existence of opposition," there is "a

substantial dispute [about] the size, nature, or effect" of Wildlife Services' actions.

*Native Ecosystems Council*, 428 F.3d at 1240.  Regarding "controversial effects,"

the EA states that "[d]issenting or oppositional public opinion, rather than concerns

expressed by agencies with jurisdiction by law or expertise and/or substantial

doubts raised about an agency's methodology and data, is not enough to make an

action 'controversial.'"  WS-NEPA-000053.  But as discussed above, cooperating

agencies with jurisdiction and expertise did express concerns echoing oppositional

public comments that the lack of any discussion around the program's effects to

connectivity and the EA's reliance on outdated data was in error—concerns that

Wildlife Services entirely dismissed.  *See Sierra Club v. U.S. Fish & Wildlife

Serv.*, 235 F. Supp. 2d 1109, 1134 (9th Cir. 2002) (requiring an EIS for mountain

lion removal due to lack of critical data and concerns over the action's effects).

Regarding the case law, Federal Defendants rely on cases from jurisdictions

without grizzly bears, where the effects of lethal predator damage management

activities on this protected species were not at issue.  Additionally, unlike the

district courts in Nevada and Colorado, which found "the EA contained an

43

extensive review of scientific articles which doubt the efficacy of lethal [predator damage management] and its impact on predator populations," *WildEarth Guardians*, 2023 WL 5529163, at \*4, here, the agency only addressed one aspect of one article, Treves (2016). Thus, because Wildlife Services disregarded a substantial body of scientific evidence and unconvincingly dismissed critical concerns about the effects and effectiveness of lethally removing grizzly bears and other apex predators, the EA is insufficient.

### D.    *Effects on Protected Species*

Finally, Plaintiffs argue that the effects on protected grizzly bears, Canada lynx, and the recently listed wolverine, *see* 88 Fed. Reg. 83,726 (Nov. 30, 2023) (final rule listing the North American wolverine as a threatened species under the ESA), weigh in favor of requiring an EIS. Federal Defendants argue Wildlife Services sufficiently addressed impacts to listed species by consulting with USFWS under ESA § 7 and obtaining "no jeopardy" biological opinions on lynx in 2009 and grizzly bears in 2012. Federal Defendants maintain that Wildlife Services' activities will not cause significant effects to grizzly bears because USFWS's post-decisional 2023 Biological Opinion on grizzly bears resulted in a "no jeopardy" finding. Similarly, the agency concludes lethal incidental trappings of wolverines are likely to be "minimal," estimating only one to two animals per year. Plaintiffs counter that there is nothing "minimal" about losing one to two

44

wolverine when the total population in the lower-48 states is less than 300 and the effective population is only 35. *See* 88 Fed. Reg. at 83,731.

The Court agrees with Plaintiffs. As discussed above, a "no jeopardy" finding does not equate to a "finding of no significance" under NEPA, *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 649–50, and the potentially significant impacts to multiple protected species weigh in favor of requiring the agency to prepare an EIS. Although the wolverine's listing occurred after the challenged decision and is therefore not a factor in the Court's review, impacts to the wolverine should be considered on remand. *See Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989) ("The reviewing court considers the reasonableness of an action not from an entirely fresh perspective but on the basis of the administrative record in existence at the time of the decision to act.").

### E.   *Conclusion*

In sum, because it is reasonable to anticipate Wildlife Services' actions may have a cumulatively significant impact on the environment, an EIS is required.

## IV.   Remedy

Under the APA, the Court "shall . . . hold unlawful and set aside agency action, findings, and conclusion found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[V]acatur of an unlawful agency action normally accompanies a remand" because

"ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid." *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). However, where equity demands, the presumption in favor of vacatur may be overcome and the Court may remand without vacatur. *Id.*; *see also Nat'l Wildlife Fed'n v. Epsy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (explaining that a reviewing court "is not required to set aside every unlawful agency action," and that the "decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity").

In determining whether to vacate an unlawful agency action, a court must weigh the "competing claims of injury . . . and the effect on each party." *Nat'l Wildlife Fed'n*, 45 F.3d at 1343; *see also Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (weighing the seriousness of the agency's error against "the disruptive consequences of an interim change that may itself be changed"). Courts may also consider "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

Having found that Wildlife Services violated NEPA by failing to adequately analyze effects and prepare an EIS, the Court must determine the appropriate

relief.  Plaintiffs ask the Court to remand the matter to the agency for a new NEPA

analysis and vacate the part of the decision that allows Wildlife Services to lethally

take grizzly bears in Montana.  Plaintiffs also request the Court enjoin Wildlife

Services' lethal removal of grizzly bears absent a demonstrable threat to human

safety.  Federal Defendants argue this is the rare case in which remand without

vacatur is appropriate.  On this issue, Federal Defendants are correct.

Contrary to Federal Defendants' arguments, Wildlife Services' errors are

neither "a relatively simple failure of accounting" nor of a "technical nature." (*See*

Doc. 54 at 7.)  Nevertheless, the Court finds that this is one of the limited

circumstances where vacatur is inappropriate.  Plaintiffs have not established that

vacatur would result in a better situation for grizzly bears in Montana.  After all,

"human tolerance much more than habitat, genetics, or food resources, will

determine where bears exist and at what density levels into the future."  WS-ESA-

004678.  For the same reasons, interim injunctive relief is denied.

While the degree to which the following statements are true may be

disputed, Wildlife Services concluded in the EA that "swift, targeted responses to

grizzly bear damage provide rural communities with a mechanism to coexist with

this threatened carnivore thus building social tolerance in a landscape where

grizzly bears were once persecuted."  WS-NEPA-000060.  The EA further opined

that "[a]lthough non-lethal methods are considered first, responsible wildlife

management sometimes requires lethal control to meet cooperators' objectives."
WS-NEPA-000013.  Additionally, Wildlife Services convincingly stated that
because private parties and other public entities, like the state of Montana, are also
authorized to provide lethal predator removal services to landowners, services
provided by non-federal entities "could result in less effective and less
environmentally responsible resolution of [predator damage management] issues"
as "there is large variability in the quality of [those] services and [their]
accountability to the public."  WS-NEPA-000532.  As stated in the EA, non-
federal entities "do not have the same skill levels, equipment, experience, or
obligations under NEPA" and "less selective and less proficient removal efforts"
may increase impacts.  WS-NEPA-000533.  And although Wildlife Services'
statements as to the effectiveness of lethal removal in general may be conclusory
and controversial, Plaintiffs have neither shown the agency's concerns are
unreasonable nor refuted the possible negative effects to human tolerance should
Wildlife Services be enjoined from lethally removing problem grizzly bears.

Because the potential "disruptive consequences of an interim change" in the
availability of lethal federal predator management in Montana outweigh Plaintiffs'
concerns about disruptions to natural connectivity and the long-term genetic
viability of grizzly bears, vacatur of the EA is inappropriate.

48

## V.        Motion to Strike

Federal Defendants move to strike the extra-record declaration of David

Mattson.  (Doc. 41.)  Because the Court did not consider the Mattson Declaration

(Doc. 33-7) in resolving this matter, the motion to strike is denied as moot.

### CONCLUSION

Accordingly, IT IS ORDERED that Plaintiffs are entitled to summary

judgment on their claims that Wildlife Services failed to take a "hard look" at the

potential environmental consequences of its predator damage and conflict

management program and an EIS is required.  Thus, Plaintiffs' motion for

summary judgment (Doc. 32) is GRANTED, though Plaintiffs' requests for

injunctive relief and vacatur are DENIED.  Federal Defendants' motion for

summary judgment (Doc. 40) is DENIED.

IT IS FURTHER ORDERED that this matter is REMANDED to Wildlife

Services to address the deficiencies identified in this Order.  Federal Defendants

must complete the NEPA process on remand on or before November 1, 2026.

IT IS FURTHER ORDERED that Federal Defendants' Motion to Strike

(Doc. 41) and Motion for Leave to Respond to Notice of Supplemental Authority

(Doc. 66) are DENIED.

IT IS FURTHER ORDERED that the Clerk of Court is directed to (1) enter

judgment in accordance with this Order and (2) close this case.

DATED this 7th day of November, 2024.

Dana L. Christensen, District Judge
United States District Court